**Dianne L. HINDERS, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

No. 4:04–CV–90121.

United States District Court, S.D. Iowa, Central Division.

Dec. 21, 2004.

Christopher D Hagen, U S Attorney's Office, Des Moines, IA, for Commissioner of Social Security, Defendant.

Timothy N Tripp, Tripp, P.C., Pella, IA, for Dianne L Hinders, Plaintiff.

## ORDER

PRATT, District Judge.

Plaintiff, Dianne L. Hinders, filed a Complaint in this Court on February 25, 2004, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed applications for Social Security Disability Benefits on April 30, 2001, claiming to be disabled since January 2, 2001. Tr. at 43–45. Plaintiff is insured for disability benefits through September of 2005. Tr. at 46. Plaintiff, whose date of birth is November 1, 1954 was 46 at the time of her application. Tr. at 43. Plaintiff graduated from college with a bachelors degree in social work. Tr. at 110. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Jean M. Ingrassia (ALJ) on September 12, 2002. Tr. at 428–82. The ALJ issued a Notice Of Decision—Unfavorable on January 10, 2003. Tr. at 13–25. After the decision was affirmed by.the Appeals Council on December 19, 2003, (Tr. at 7–11), Plaintiff filed a Complaint in this Court on February 25,

2004. On October 25, 2004, the Commissioner filed a motion to remand. Remand is sought to give the ALJ the opportunity to further evaluate Plaintiff's impairments and allegations of fibromyalgia and chronic fatigue syndrome. The Commissioner further states that the ALJ will be directed to evaluate the opinions of treating physicians, Wolfe and Swinton and to reassess Plaintiff's residual functional capacity. The Commissioner wrote: "While we do not believe that the evidence warrants an outright reversal of this case, the inconsistencies in the ALJ's decision should be corrected in order to ensure that Plaintiff's claim receives proper consideration." (Commissioner's Brief). Later on the same day that the Commissioner moved for remand, Plaintiff resisted arguing that the evidence in the record before the Court supports a reversal with an award of benefits and that further proceedings will only delay the receipt of benefits to which Plaintiff is entitled. The Court's review, therefore, will focus on the issue of remand versus outright reversal.

Plaintiff sought services from the Iowa Division of Vocational Rehabilitation during the period April 20, 1999, through February 23, 2002. Tr. at 105–16. On the intake summary it is noted that Plaintiff was working at a part-time job which was scheduled to be phased out in August of 1999. Plaintiff reported problems following a stroke which she suffered March 4, 1998. Plaintiff said she experienced right side weakness with continued stuttering. Plaintiff also experienced balance and vision problems. Plaintiff reported that she is easily fatigued and needs to pace herself. Tr. at 110. On February 25, 2000, it was noted that Plaintiff was being paid $14.70 an hour, and was working 10 to 15 hours per week. Tr. at 111. Plaintiff spoke with her counselor on October 24, 2000. Plaintiff was upset over her lack of energy. She said she was constantly fatigued and felt as though she was working without pay much of the time in order to complete her paper work. The counselor wrote that Plaintiff has ongoing problems with stamina and fatigue. Tr. at 112. On March 9, 2001, Plaintiff informed her counselor that she had quit her job because of her extreme fatigue. Tr. at 113. On March 30, 2001, Plaintiff's counselor spoke to her about applying for Social Security. As noted above, it was on April 30, 2001 that Plaintiff applied for benefits. The Counselor wrote that Plaintiff was upset about not being able to continue her profession as a social worker. Plaintiff's vocational rehabilitation file was put into an interrupted status pending the outcome of the Social Security case. Tr. at 114.

Plaintiff was admitted to the hospital in Marshalltown, Iowa on March 4, 1998. Plaintiff provided a history that after she had returned home from a drive, her right arm went numb. A short time later, she became unable to talk. At the hospital, her speech was slurred and there was a loss of touch sensation on her left side. Tr. at 148. It was noted that Plaintiff has a Bachelor's Degree and was a social worker. As the interview progressed, Plaintiff's speech began to clear. Tr. at 149. After a physical examination (Tr. at 149–50), T.W. Swinton, M.D. opined that Plaintiff was undergoing a cerebral vascular accident, possibly a transient ischemic attack. The doctor also considered the possibility that Plaintiff was having an atypical migraine. The doctor wrote: "Also she's had a schizoid type personality problem in the past, and depression with a psych overlay with this." It was also noted that Plaintiff has asthma, and Meniere's disease for which she takes medication to control dizziness. Plaintiff was admitted to the hospital for observation and to do neural checks. Tr. at 150.

Plaintiff was admitted to the hospital at the University of Iowa on March 7, 1998, and discharged on March 24, 1998. The diagnoses were: 1) culture-negative endocarditis; 2) aortic insufficiency secondary to # 1; 3) embolic cerebrovascular accident with right sided symptoms and dysarthria, resolved; 4) renal insufficiency; and, 5) gastroesophageal reflux disease. Tr. at 154.

Plaintiff was admitted to the hospital at the University of Iowa on April 14, 1998 and discharged on the 21st. On the day of admission, she presented with fatigue, gait difficulties and myalgias. Plaintiff said that she felt as though her body leaned to the left when she walked. She complained of a sensation of lightheadedness, as though she were at a high altitude. She also reported difficulties finding words. Tr. at 164. A CT scan of Plaintiff's head was normal. Later, an MRI of the brain revealed mild cerebellar atrophy of nonspecific significance. Other tests were unremarkable. The neurological team did not feel that Plaintiff's examination represented a focal neurologic deficit. Instead, it was recommended that Plaintiff continue with physical therapy. The team opined that Plaintiff's symptoms would significantly improve with time. Tr. at 165.

Plaintiff was seen on May 12, 1998 at the Neurology Clinic of the University of Iowa. The inability to walk without maintaining a wide gait and some visual disturbances were the only neurological symptoms reported. Tr. at 169. Enrique C. Leira, M.D. wrote that Plaintiff was using a cane, and that he stressed to Plaintiff the risk of falling. Tr. at 171. Plaintiff was seen again at the University on June 25, 1998 (Tr. at 172–74), and on October 19, 1998. On October, 19, Plaintiff was observed to twice veer to the left when walking, but she did not fall. She displayed gait unsteadiness on examination. Tr. at 175.

In 1995 and 1996, Plaintiff was seen a number of times at the Four Rivers Mental Health Association. Jerry L. Lewis, M.D. diagnosed Plaintiff with a bipolar disorder. Tr. at 182–94. Plaintiff saw Dr. Lewis again on March 31, 1999. She was concerned about depression along with her fatigue. After a mental status examination, Dr. Lewis opined that Plaintiff was not depressed, and that her fatigue was due to her medical illnesses rather than her bipolar illness, which he wrote was in remission. Tr. at 179.

Plaintiff saw Jonathan Fudge, M.D. at Heart & Vascular Care in Des Moines, Iowa. Plaintiff complained of "some atypical sounding chest discomfort," and fatigue. The doctor wrote:

Review of systems is remarkable for some dyspnea on exertion and fatigue. She had the recent bronchitis with a productive cough. She denies any recent fevers or chills. She has had no skin rashes. She denies any visual disturbance. It sounds like she did have a problem with some weakness of her right arm though she is rather nondescript in describing this. She has not had recurrence of this. She has had no problems with aphasia or word finding.

Tr. at 195. On physical examination, Plaintiff demonstrated what Dr. Fudge called a 1/6 systolic murmur and a soft 1/6 diastolic murmur. The doctor scheduled Plaintiff for an assessment of her aortic valve. The doctor wrote that his suspicion for endocarditis was low. He said that if Plaintiff appeared to have severe aortic insufficiency, he would consider angiography. Tr. at 196. Plaintiff saw Dr. Fudge again on June 5, 2000, after undergoing the tests that the doctor had ordered. "She did have severe aortic insufficiency.

There was no evidence of vegetations[1] on either the aortic or mitral valve." Plaintiff reported that she was working 15 to 40 hours per week. She reported dyspnea on exertion and fatigue. Tr. at 200. Dr. Fudge prescribed mediation—Procardia— to take stress off of Plaintiff's valve. The doctor opined that at some point within the next couple of years, Plaintiff would need a valve replacement. Tr. at 201. When Dr. Fudge saw Plaintiff on December 7, 2000, she reported some fatigue, occasional lightheadedness and palpitations. Again, Plaintiff reported dyspnea with exertion. Tr. at 202. The doctor modified Plaintiff medication dosage, and ordered a Holter monitor evaluation. Tr. at 203. An echocardiogram report dated December 7, 2000, showed aortic valve sclerosis and moderate to severe aortic insufficiency. Left ventricular size and systolic function were both noted to be normal. Tr. at 205. Plaintiff saw Dr. Fudge on January 9, 2001. The doctor had reviewed the results of the Holter monitor which he said showed sinus rhythm with "PVCs" and "PACs." Tr. at 207. After his examination, the doctor wrote that Plaintiff was stable, and that her blood pressure was better. The doctor instructed Plaintiff regarding symptoms which she should report if they occur. Tr. at 208.

On February 7, 2001, Plaintiff saw Frederick Wolfe, M.D. at the Arthritis Research & Clinical Center in Wichita, Kansas. In a letter to Dr. Swinton, Dr. Wolfe wrote:

> ... [S]he has multiple positives on review of systems, for example [she] has generalized pain generalized tenderness, fatigue at score of 2.8 on a 3.0 visual analog scale, sleep disturbance at the

same level, global severity at 73% of maximum, pain at 2.4 on a 3.0 scale, GI symptoms of 2.3 on a 3.0 scale, and high levels of functional disability, probably at a 3.0 scale, GI symptoms of 2.3 on a 3.0 scale, and high levels of functional disability, probably at about the 70th to 80th percentile of patients with rheumatic disorders. But the thing that is most bothersome, of course, as you indicated, is the fatigue. When I examined Ms. Hinders, I found that she was tender at all of the fibromyalgia tender point regions and also had generalized tenderness.

Dr. Wolfe noted that unlike many patients with fibromyalgia, Plaintiff had low scores for anxiety and depression, and Plaintiff is intolerant of antidepressant medication that is often used to treat fibromyalgia. Regarding treatment, the doctor wrote that he "would be very worried that any medication that one might give, given her degree of renal impairment and cardiovascular impairment, would cause problems, and I would want to be very careful about that." Tr. at 210. Dr. Wolfe made several recommendations for medication therapy but opined that Plaintiff was going to need a valve transplant. "These other therapies are stopgap measures and I suggest them as a possibility." Tr. at 211.

Plaintiff saw gastroenterologist Jon D. Gibson, M.D. on March 12, 2001. Plaintiff described cramping right lower quadrant pain, alternating constipation and diarrhea with mucorrhea and urgency and aggravation of her symptoms with opiates. Plaintiff said that her symptoms had been present since at least 1974, but that in the fall of 1999, she developed more frequent

---

1. It should be recalled that the hospital record dated March 7, 1998, noted "culture-negative endocarditis." *See also,* the definitions of endocarditis in Steadman's Medical Dictionary, 27th Edition, which lists vegetative endocarditis among the various sub-definitions: Endocarditis ... vegetative, e., verrucous e., associated with the presence of fibrinous clots (vegetations) forming on the ulcerated surfaces of the valves."

symptoms together with nausea, rectal pain or tenesmus, low back pain, and intermittent pain in the left hip and lower quadrant that she described as a spasm. Dr. Gibson opined that Plaintiff's symptoms were more typical of irritable bowel syndrome that of an inflammatory bowel disease. Tr. at 220. The doctor arranged for a colonoscopy. Tr. at 221. The colonoscopy took place on March 21, 2001. Dr. Gibson's impression was that other than a diminutive rectal polyp the study was otherwise normal without gross evidence for ulcerative colitis. Tr. at 224–25.

Plaintiff underwent coronary angiography on June 14, 2001. The study showed normal coronary arteries; normal left ventricular function; no evidence of mitral regurgitation; moderate aortic regurgitation; and, elevated left ventricular end diastolic pressure. Based on the study, it was recommended that medical therapy and valvular surgery be considered. Tr. at 228.

On June 19, 2001, Plaintiff saw Brian J. Steiner, Psy.D. for a psychological evaluation at the request of Disability Determination Services. Evaluation procedures consisted of a clinical interview, social history and mental status examination. Dr. Steiner listed Plaintiff's impairments:

> She has aortic insufficiency, asthma, chronic bronchitis, Miniere's Disease, ototoxicity [2] with distibular (sic.vestibular?) damage, endocarditis, history of aortic valve disease, hypertension, renal insufficiency, and mild hyperlipidemia, irritable bowel syndrome, over-inflammatory bowel disease, fibromyalgia and chronic fatigue, history of stroke and T.I.A.'s migraines, ocular migraines, gastrointestinal reflex disorder, history of peptic and duodenal ulcers, rosacea.

Plaintiff said her medications were: Procardia, Triamterene, Premarin, Acufex, Vansunace pocket taylor, Terraced aspirin, Clonazepam, Amitriptyline, Claritin, Hyoscyamine, Hyoscyamine Sulphate, Ultram, Promethazine, fish oil calcium with vitamin D, Tylenol, and Ibuprofen. Tr. at 231. Plaintiff's education consisted of a degree in social work from the University of Northern Iowa and some graduate courses. Tr. at 232. Plaintiff said that her daily activities might include what for her is a fairly large task such as mailing letters or picking up medications. Plaintiff said that she had difficulty sleeping at night. After the mental status examination, Dr. Steiner diagnosed major depressive disorder, recurrent. Tr. at 233. The psychologist concluded his report by stating his opinion that Plaintiff may have difficulty remembering and understanding instructions, procedures, and locations. He said that Plaintiff might also have difficulty carrying out instructions by maintaining attention, concentration, and pace. He said that Plaintiff appears able to interact appropriately with supervisors, coworkers and the public. He said that Plaintiff appears able to use good judgment and respond appropriately to changes in the work place. Tr. at 234.

On July 16, 2001, Kent C. Thieman, M.D. wrote to Dr. Swinton. After a review of Plaintiff's history and an examination, Dr. Theiman opined that Plaintiff is a candidate for aortic valve replacement. Surgery was planned for July 26, 2001. Because of her history of TIAs, the doctor wanted Plaintiff to be seen by a neurologist before surgery. Tr. at 236. Plaintiff saw Lynn M. Rankin, M.D. on July 18, 2001 for the neurological evaluation. Plaintiff reported that since 1998, she has had TIA-like episodes every 3 to 4 months. The day before the examination, Plaintiff

---

**2.** The property of being injurious to the ear.  Steadman's Medical Dictionary, 27th Edition.

had an episode where she felt weak all over. Most of the time, Plaintiff said she will get a sudden onset of weakness on the right side and numbness in her right arm. This will gradually clear over 5 minutes. Sometimes she may have blurry vision in the right eye or shimmering vision. Plaintiff also reported a 20 year history of ocular migraines consisting of a visual aura which progresses from the right to left side. They can last up to an hour. Tr. at 237. Plaintiff provided a list of 16 medications. Tr. at 238. After the neurologic evaluation, Dr. Rankin recommended an MRI of the brain with intracranial and extracranial MRA. Tr. at 240.

The MRI, done July 23, 2001, showed several small foci of abnormal increase in signal involving primarily the subcortical white matter of both cerebral hemispheres. Kent Quinn, M.D., opined that the study indicated "Possible TIA vs. CVA, history of stroke." Tr. at 241.

Plaintiff was hospitalized at Iowa Methodist Medical Center from July 26 to 30, 2001, during which time she underwent an aortic valve replacement. Her post operative course was unremarkable and she participated in cardiac rehabilitation. She was discharged in good condition. Tr. at 244. The cardiac rehabilitation discharge note dated September 26, 2001, states that Plaintiff continued to have fatigue, but there had been improvement since the surgery. Tr. at 285.

Plaintiff saw Dr. Fudge on April 30, 2002. Plaintiff reported a month long history of chills and fevers, some as high as 101. Tr. at 317. Because of the aortic valve replacement, Dr. Fudge ordered further tests, and advised Plaintiff to continue checking her temperature. Tr. at 318. Plaintiff underwent a transesophageal echocardiogram on May 1, 2002. Tr. at 319. Dr. Swinton's office note dated May 30, 2002, states that Dr. Fudge had report-ed that the tests he ordered were negative. Dr. Swinton wrote that Plaintiff and Dr. Fudge had a falling out and that Plaintiff had left his office before all to the tests could be done. Dr. Swinton said that Plaintiff would continue her care at Iowa Heart Center. Dr. Swinton also stated that Plaintiff demonstrated signs and symptoms of depression so he recommended that Plaintiff seek psychiatric therapy to which Plaintiff agreed. Tr. at 321.

The Court has read Dr. Swinton's extensive treatment notes. Tr. at 321–413. No purpose would be served by discussing each of the entries in detail, other than to note that Dr. Swinton, is Plaintiff's primary treating doctor and his notes reflect the conditions for which referrals were made to the specialists discussed above as well as his own treatment. On a questionnaire dated May 30, 2002, Dr. Swinton stated he began treating Plaintiff in March 1998 for illnesses such as chronic fatigue, mitral valve prolapse, the aortic valve, endocarditis, hyperlipedema, renal insufficiency, migraines, Meniere's disease. The doctor stated the Plaintiff's prognosis was fair. Tr. at 404. The doctor said Plaintiff's symptoms include multiple tender points, chronic fatigue, morning stiffness, muscle weakness, swelling, irritable bowel syndrome, frequent severe headaches, vestibular dysfunction, numbness and tingling dry eyes and mouth, raynaud's phenomenon, breathlessness, mitral valve prolapse, and chronic fatigue syndrome. The doctor wrote that Plaintiff is not a malingerer. He said that she has pain throughout her spine, chest, shoulders, arms, hands and fingers, hips, legs, knees, ankles, and feet. Tr. at 405. The doctor said that Plaintiff experiences a variety of pain, but that someplace on her body hurts her most of the time. He said that factors such as changing weather, fatigue, overuse, stress,

cold, hormonal changes, and static position precipitate pain. The doctor indicated that Plaintiff's impairments are consistent with the symptoms and limitations he wrote about. The doctor said that Plaintiff was incapable of even low stress work. He said that side effects of medication include headache, drowsiness, and dry mouth. Tr. at 406. The doctor opined that Plaintiff is able to walk a block, sit for 15 minutes and stand for 10 minutes at a time. He said she is able to sit and stand for less than two hours during a day. He said that Plaintiff would require a job which allowed for changing from standing to sitting, at will. Tr. at 407. The doctor said that Plaintiff would need to use a cane from time to time to help her walk. Because of Plaintiff irritable bowel syndrome, he said that she would need to be allowed unscheduled breaks the frequency of which would vary depending on the illness. Because of swelling of the feet, the doctor said that Plaintiff would need to elevate her feet to the level of her heart. He said that Plaintiff would be only able to lift 10 pounds, and only occasionally as opposed to frequently. Tr. at 408. The doctor stated that Plaintiff's hands could be used for grasping, twisting etc. objects 10% of the time and that she could use her fingers 25% of the time. The doctor said that Plaintiff would not be able to reach with her arms. Finally, the doctor wrote that Plaintiff would have good and bad days and could be expected to be absent more than four times a month. Tr. at 409.

Although the Court has read the transcript of Plaintiff's testimony before the ALJ, there is no point to a detailed summary of it here. After Plaintiff testified, the ALJ called Brian Paprocki to testify as a vocational expert. Tr. at 474. The ALJ asked the vocational expert if he had heard anything which would indicate that past relevant work would be precluded. Tr. at 475. He responded that if Plaintiff's irritable bowel syndrome required immediate access to toilet facilities her past work would be precluded. He said that family counseling jobs require the social worker to go to people's homes. The ALJ asked if Plaintiff would have transferable skills to sedentary work which did not require travel. The vocational expert responded that an eligibility worker would fall into that category. Tr. at 476. The vocational expert also said the work of a record reviewer would be possible. Tr. at 477. When asked to speak to the issue of reliability, the vocational expert responded:

Reliable in attendance, being there every day, being able to work consistently through the day, not take too many bathroom breaks more than, say, five percent of the job—of the time she's actually working on the job. That would be fairly consistent with industrial timing standards and being able to concentrate on the job to remain a normal level of accuracy.

Tr. at 478.

In the Decision of January 8, 2003, the ALJ wrote that she could not give Dr. Swinton's residual functional capacity opinion the weight normally due that of a treating physician "... because of the interpretative problems inherent in the use of forms such as the functional capacity checklist, while these forms are admissible, they are entitled to little weight and do not constitute 'substantial evidence' on the record as a whole. *O'Leary v. Schweiker,* 710 F.2d 1334, 1341 (8th Cir.1983)." Tr. at 22. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability, and that she has severe impairments which do not meet the requirements of any listed in Appendix 1, Subpart P, Regulation No. 4. Tr. at 24. The ALJ found that although Plaintiff is unable to do any of her past relevant work, she retains the residual functional capacity

for sedentary work and could do the jobs identified by the vocational expert at the hearing. The ALJ found, therefore, that Plaintiff was not disabled nor entitled to the benefits for which she applied. Tr. at 25.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975). *See also Patrick v. Barnhart,* 323 F.3d 592, 595 (8th Cir.2003).

The issue in this case, as stated above, is whether or not the Commissioner's motion to remand should be granted or whether the Court should reverse outright and order benefits awarded to Plaintiff. Plaintiff urges the court to take the later course. The Court agrees with Plaintiff.

In *Seavey v. Barnhart,* 276 F.3d 1 (1st Cir.2001), the Commissioner moved for a remand because the ALJ had improperly relied on the medical vocational guidelines to make a finding of not disabled. The Commissioner conceded error because Seavey had nonexertional impairments which required vocational expert testimony. *Seavey* at 6. The Commissioner appealed the District Court's award of benefits. The Court of Appeals wrote: "... [W]e find that the decision as to what remedy to apply under sentence four of § 405(g) is largely dictated by the type of error made by the ALJ or Commissioner..." *Id.* at 9. The Court agreed that the ALJ had been in error by ignoring relevant and material evidence which showed Seavey had nonexertional impairments which could significantly impair his ability to perform the full range of light or sedentary work. *Id.* at 10. The Court held:

[T]he rule we adopt is that ordinarily the court can order the agency to provide the relief it denied only in the unusual case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or to deny benefits. Put differently, if the evidence and law compelled one conclusion or the other, then the court could order an award of benefits or affirm a denial of benefits. For example, a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence. *See Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985). Similarly, if correcting the legal error clarified the record sufficiently that an award or denial of benefits was

the clear outcome, then the court may order payment or affirm denial. Conversely, if an essential factual issue has not been resolved, as here, and there is no clear entitlement to benefits, the court must remand for further proceedings.

*Id.* at 11.

In this case, the Commissioner requests remand

> ... in order for the ALJ to further evaluate Plaintiff's medically determinable impairments, to include her allegations of fibromyalgia and chronic fatigue syndrome (records of Drs. Wolfe and Swinton; Tr. 210, 321–40). The ALJ will also be directed to evaluate the opinions of treating medical sources (Dr. Swinton May 30, 2002, Tr. 404–09; Dr. Fudge October 1, 2002, Tr. 414–15) in accordance with 20 C.F.R. § 404.1527 and SSR 96–2p. In addition, the ALJ will further evaluate Plaintiff's residual functional capacity and provide sufficient rationale with specific references to the evidence of record. The ALJ will be directed to further evaluate Plaintiff's subjective complaints in accordance with SSR 96–7p, to include Plaintiff's work history.

The Court agrees with Plaintiff that all of the things referred to by the Commissioner have already been adequately considered by the ALJ, and that further proceedings will only lead to one outcome, namely that Plaintiff is disabled and entitled to the benefits for which she applied. In *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir.1987), then Chief Judge Lay wrote that while a remand is the usual remedy in cases where an erroneous finding that a claimant can return to past relevant work, "... where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand."

Here, from beginning to end, the record is consistent that Plaintiff suffers from irritable bowel syndrome, chronic pain and fatigue, as well as all her other impairments. Plaintiff has sought medical treatment from her family physician and the specialists to which Dr. Swinton made referrals. Plaintiff has taken a variety of medication, and underwent cardiac surgery. None of the treatment has restored her health. Dr. Swinton provided a clear statement of Plaintiff's inability to work[3].

---

**3.** The ALJ cited *O'Leary v. Schweiker,* 710 F.2d 1334 (8th Cir.1983) as authority for rejecting the residual functional capacity form completed by Dr. Swinton. In *O'Leary,* the RFC form rejected by the Court was distinguishable from that used in the case *sub judice.* The *O'Leary* form was completed by a doctor who saw Plaintiff on two occasions for consultative examinations which were two years apart. After the second examination the doctor stated on the RFC form that O'Leary could sit for four hours and could stand for four hours in an eight hour day. The treating physician, on the other hand, had stated that O'Leary was precluded from work that required "prolonged" sitting and standing. The treating physician had never been asked how many hours his patient could sit and/or stand. The Court noted that there was no indication of how the consult-

ing physician had arrived at his opinion. Furthermore, the consulting physician's reports stated that because of her disabilities, employment—even in a sedentary job—would be difficult. Finally, the opinion on the RFC form was contrary to all the other evidence in the record. The Court, therefore, held that the ALJ's primary reliance on the form was error.

In the case *sub judice,* on the other hand, the questionnaire is much more detailed than an RFC check list. This form was completed by a treating physician who had a long relationship with Plaintiff. Dr. Swinton was asked in very specific terms to state how long Plaintiff could do each of the activities listed. Dr. Swinton's opinion is consistent with the other medical and vocational evidence in the record. Just as it was error for the ALJ in

The vocational expert testified that Plaintiff's irritable bowel syndrome would preclude her from her past work. He also testified that Plaintiff's inability to be a reliable employee would prevent her from any other type of work. This testimony is consistent not only with Plaintiff's testimony and the medical records, but also with the evaluation by the Iowa Department of Vocational Rehabilitation whose counselor suggested that Plaintiff consider making her application for disability benefits. There is nothing further to consider. Plaintiff is disabled and entitled to disability benefits as provide in the Social Security Act.

In *Bradley v. Bowen*, 660 F.Supp. 276, 279 (W.D.Ark.1987), Circuit Judge Richard S. Arnold, sitting by designation as a district judge, wrote:

> The weighing of conflicting evidence is generally a matter of fact-finding for the ALJ, and will not be disturbed on review if the result is one which " 'a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 ... (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 ... (1938). But there are occasions when the bulk of the evidence is transparently one-sided against the ALJ's decision. In those instances, the reviewing court must reverse the administrative determination on the ground of unreasonableness. *See Gavin*, 811 F.2d. At 1199–1201 ... and see generally, *Deuter v.*

*Schweiker*, 568 F.Supp. 1414 (N.D.Ill. 1983).

Applying the principles set forth by the Court of Appeals in *Seavey v. Barnhart*, as well as the decisions from the Court of Appeals for the Eighth Circuit cited above, it is the holding of this Court that a remand to take additional evidence would do nothing other than delay the receipt of benefits to which Plaintiff is clearly entitled.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen*, 660 F.Supp. 276, 279 (W.D.Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The final decision of the Commissioner is reversed and the Commissioner is ordered to award Plaintiff the benefits to which she is entitled. The motion to remand for further administrative proceedings is denied. The case is remanded for the sole purpose of computing and awarding Plaintiff the benefits to which she is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42

*O'Leary* to rely on the RFC form as his primary piece of evidence upon which he based

the denial of benefits, it was error for the ALJ

U.S.C. § 406 B), and LR 54.2(b) [4].

IT IS SO ORDERED.

in the case at bar to reject Dr. Swinton's opinion out of hand.

4. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifi-cally identify the positions taken by the government in the case that the applicant alleges were not substantially justified."