**Karla K. McPHERSON, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 4:04–CV–90180.**

United States District Court, S.D. Iowa, Central Division.

Feb. 9, 2005.

954

Gary L Hayward, United States Attorney, Second FLR Courthouse Annex, Des Moines, IA, for Commissioner of Social Security, Defendant.

Gregory W Peterson, Elverson Vasey & Peterson, LLP, Des Moines, IA, for Karla K McPherson, Plaintiff.

## ORDER

PRATT, District Judge.

Plaintiff, Karla K. McPherson's, filed a Complaint in this Court on March 29, 2004, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed applications for Social Security Disability Benefits on January 19, 2001, claiming to be disabled since November 30, 2000. Tr. at 76–78 & 378–80. Plaintiff is insured for disability benefits through June of 2002. Tr. at 84. Plaintiff, whose date of birth is December 7, 1978, was 23 at the time of her application. Tr. at 76. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge John P. Johnson (ALJ) on May 1, 2003. Tr. at 394–447. The ALJ issued a Notice Of Decision—Unfavorable on July 23, 2003. Tr. at 22–31. After the decision was affirmed by the Appeals Council on February 21, 2004, (Tr. at 6–8), Plaintiff filed a Complaint in this Court on March 29, 2004.

Plaintiff was seen by Jerry Lewis, M.D. on December 14, 1999. Plaintiff reported a history of mild depression for a number of years. She said that the depression became worse at the time of her father's death, and that it had become more intense in the previous month. She had recently quit a job because "it was just taking too much of her time," and had also broken up with a boyfriend. After

completing the history and mental status examination, Dr. Lewis diagnosed major depressive disorder and prescribed medication. Tr. at 172–73.

Plaintiff was a patient at the University of Iowa Hospitals and Clinics from February 29 to March 9, 2000. She was admitted to the hospital after overdosing on medication. Plaintiff's history included her report that after her father died, she took care of her mother who has diabetes and MS. During her senior year of high school, her mother threw her out of the house and claimed Plaintiff was abusing her. Plaintiff "moved in with a man who abused her." Plaintiff attended one semester of college and then worked at two office jobs, each for six months. She had recently had her mother committed to a mental health institution. After Plaintiff and a boyfriend had been together for a year and a half, he and his ex-wife moved in with Plaintiff. Plaintiff was being evicted by her landlord, and bills had been piling up. Plaintiff reported anhedonia, and said that most days she did not want to get out of bed. She had been thinking of suicide for the previous three weeks, and the day before the hospitalization she took several pills which included Paxil, Tylenol, Benadryl and Aldactone. During a phone call, a friend noted Plaintiff's speech and called for emergency help.

Plaintiff reported that two weeks after seeing Dr. Lewis, she quit taking the medication he had prescribed. Plaintiff's history included being treated at the University in 1996 for acanthosis nigricans [1] with obesity hirsutism, menstrual irregularity and insulin resistance. Tr. at 174.

During the hospitalization, Plaintiff was diagnosed with a major depressive disorder and started on Celexa. Plaintiff remained depressed and suicidal on days two and three of the hospitalization. Thereafter, her mood began to improve and she was discharged to partial hospitalization on March 8. Tr. at 175. See also Tr. at 191–95 which are the records of the partial hospitalization March 16 to 24, 2000.

Plaintiff was seen at South Central Mental Health Center on several occasions by Dr. Lewis and by Clinical Social Worker, Rita Schacherer, ACSW, throughout 2000. Tr. at 178–90. On January 16, 2001, Dr. Lewis' office note states that Plaintiff had been seen by doctors at Broadlawns Medical Center in Des Moines. The doctors had re-initiated Plaintiff's prescription of Zoloft, and Plaintiff said she felt better. Plaintiff said she was hiding from people such as the auto company which was attempting to repossess her car because she had not been able to make her payments. Tr. at 201. Ms. Schacherer's note of January 4, 2001, states that Plaintiff had "become significantly more depressed over the past week..." Plaintiff had "come to think of her life as pointless, she is without purpose or money." Plaintiff agreed to return to the mental health center the next day and arrange for hospitalization. Tr. at 241. On January 16, 2001, it was noted that Plaintiff had been hospitalized at Broadlawns Hospital in Des Moines. Plaintiff has signed herself out of the hospital "because she felt she could not get much help there and she could make proper commitments not to harm herself." Plaintiff had kept close to her friends and was taking her medication faithfully. Nevertheless, she felt uneasy, anxious and depressed. Tr. at 238. On January 23, 2001, Plaintiff stated she had run out of medi-

---

1. Acanthosis: An increase in the thickness of the stratus spinosum of the epidermis... nigricans: an eruption of velvet warty benign growths and hyperpigmentation occurring in the skin of the axillae, neck, ano-genital area, and groin; in adults, may be associated with internal malignancy, endocrine disorders, or obesity; a benign hereditary type occurs in children. Stedman's Medical Dictionary, 27th Edition.

cation and was unable to find assistance getting refills through the county. Tr. at 236. The Social Worker, made arrangements for Plaintiff to get samples of the medication. Tr. at 237. An Emergency/Crisis Report from the Mental Health Center dated February 20, 2001, states that a letter from Plaintiff had been received in which Plaintiff stated that she felt like an empty shell and that she was taking up space which could be better used by someone else. Plaintiff's friends were contacted and asked to check on her. Tr. at 235. Plaintiff saw Ms. Schacherer on February 23, 2001. Plaintiff described intense depression characterized by feeling dead inside. Plaintiff was working at a nursing home and reported that during her work day she had an intensely sad mood and a sense of purposelessness. Plaintiff was taking her medication as prescribed but was awaiting for a certificate from a drug company so she could obtain more. She was about to run out of Zoloft and did not have money to buy more. She was told to go to Dr. Lewis' office to get more samples. Tr. at 232. Plaintiff was advised to go to the University's emergency room if her mood became worse. Plaintiff said she wanted to work through the weekend so she would not jeopardize her employment. Tr. at 233. On March 2, 2001, Plaintiff said she was having trouble working because of the stresses associated with it. She wondered how long she would be able to continue working. Tr. at 230.

Ms. Schacherer's note of March 15, 2001, states that Plaintiff reported that a close friend had been in an auto accident in which her friend's son had been killed. "In addition, she has not been feeling well, feels weak and tired, aches in her joints and muscles, struggles with any kind of physical exertion. She, in general, does not feel well." Tr. at 223. Dr. Lewis' note dated March 15, 2001, states that laboratory work showed "hemoglobin of very low proportions." Tr. at 198. On April 5, 2001, Dr. Lewis wrote that he sent Plaintiff to a hospital where she was transfused twice. When Plaintiff thought her hemoglobin was dropping again, she went to an emergency room where x-rays were taken and an appointment was made for a colonoscopy. Plaintiff said that the night before the procedure, she received a phone call from the hospital and was informed that because she had no insurance, her appointment was canceled. Plaintiff reported that she was feeling weak and tired. Tr. at 196. Plaintiff also saw Ms. Schacherer on April 5, 2001. Tr. at 218.

In a letter dated April 9, 2001, to Dr. Lewis, Raymond Hohl, M.D., Ph.D., at the University of Iowa's Division of Hematology, Oncology, and Blood & Marrow Transplantation, stated that Plaintiff was being seen for evaluation and treatment of her newly diagnosed iron deficiency anemia. Tr. at 207. Plaintiff was scheduled for iron therapy. Tr. at 208. On April 25, 2001, Dr. Hohl wrote that Plaintiff was admitted to the hospital for intravenous iron replacement. She was also referred to the Digestive Disease Clinic for a colonoscopy to evaluate the source of Plaintiff's gastrointestinal blood loss. Tr. at 206. Plaintiff was seen at the Center for Digestive Diseases on April 24, 2001. Plaintiff reported a change in her normal bowel habits during the previous four to five months. Plaintiff reported pain which she described as sharp and stabbing, severe enough to take her breath away. Tr. at 202. After the examination, a colonoscopy was ordered. Tr. at 203.

A mental health note written by Ms. Schacherer on May 3, 2001, states that during the previous week, Plaintiff had become very negative, sad and tearful, couldn't sleep, and that she wrote a long letter detailing how worthless and unimportant she felt. This seemed to have been precipitated by the failure of a friend

to come to her home as expected. Tr. at 210. It was noted that Plaintiff "continues to struggle with almost everything in her life." It was also noted that although Plaintiff was making slow, steady progress, there was much that needed to be done and that she seems to find periods of getting stuck attractive because of the attention and supports she gets during those times. Tr. at 211.

Plaintiff saw Dr. Hohl on May 30, 2001, four weeks after her IV iron treatment. Plaintiff noted significant thinning of her scalp, mild GI blood loss, occasional headaches and fatigue. Dr. Hohl emphasized the importance of a colonoscopy which was planned for June 14, at the University. Dr. Hohl wrote that Plaintiff's iron deficiency anemia appeared to have resolved, but was likely to return unless the source of the GI bleeding could by found and treated. Tr. at 242.

Plaintiff underwent the colonoscopy on June 14, 2001. Tr. at 317. On June 20, 2001, Jeffrey Field, M.D. wrote to Dr. Hohl that the study showed abnormal colonic mucosa, throughout much of the colon, but the rectum appeared spared. There were two suspected inflammatory polyps that were removed. Dr. Field wrote that preliminary results suggested acute and chronic inflammation throughout the colon and mild inflammation in the terminal ileum. Tr. at 263. Dr. Field wrote that the results were more consistent with ulcerative colitis than Crohn's disease, but that rectal sparing would be unusual for colitis. He wrote that he suspected that the inflammation in the terminal ileum was from "back-wash ileitis". The doctor stated that Crohn's disease needed to be considered. Tr. at 264.

Plaintiff saw Dr. Field again on August 27, 2001. Plaintiff's symptoms did not respond to the medication he had prescribed but that he wanted her to remain on it. He also prescribed prednisone. The doc-

tor noted that Plaintiff had undergone an upper GI and small bowel follow through. The studies revealed a patulous gastroesophageal junction with some reflux. On examination, Plaintiff was tender in both lower quadrants of her abdomen. Plaintiff's diagnoses included inflammatory bowel disease and probable Crohn's colitis. Tr. at 288.

On December 31, 2001, Plaintiff saw Richard A. Martin, Ph.D. at the request of Disability Determination Services. Tr. at 291–94. Dr. Martin had been asked to provide a behavioral description, daily activities, and ability to handle funds. The evaluation was also to include examination of Plaintiff's ability to remember and understand instructions, procedures, and locations; maintain attention, concentration, and pace of instruction; interact appropriately with supervisors, coworkers, and the public; and use good judgment and respond appropriately to workplace changes. Tr. at 292. Plaintiff reported that she lived by herself. She said that she was a high school graduate and had completed one semester of college. Plaintiff said that she had left her last employment after three months because her anxiety was out of control and she was becoming physically sick. Plaintiff longest employment had lasted a year. Plaintiff reviewed her medical treatment for Dr. Martin. The psychologist does not make reference to any medical records. Tr. at 291. Plaintiff was given a standard mental status examination, a structured interview, and the Mini-Mental State Examination. Tr. at 292. After his examination, Dr. Martin opined that Plaintiff appeared to possess the cognitive abilities required to work within a wide range of simple unskilled and semi-skilled jobs. "However, given her underlying emotional problems, poor coping skills, and notable borderline personality disorder features, she does appear likely to experience problems interacting with su-

pervisors, co-workers, and the public." Tr. at 293. Dr. Martin concluded his report by writing that the extent of Plaintiff's mood problems was difficult to assess because of her strong borderline traits, and her apparent tendency to exaggerate her emotional symptoms. Tr. at 294.

Plaintiff saw Ms. Schacherer at the Pine Rest Christian Mental Health Services in Pella, Iowa, on February 21, 2002. Tr. at 335–37. Plaintiff had been unemployed for at least a year at the time of the examination. Plaintiff reported that she recently learned that she was pregnant out of wedlock and was unsure of the paternity of the baby. Plaintiff said that she had engaged in a variety of unstable relationships in an effort to have closeness to someone. She did not expect that either of the men who could be the father would be any help to her in the future. Plaintiff reported that she had an appointment with Dr. Lewis at the University of Iowa. Tr. at 335. After a mental status examination, the Axis I diagnoses were Adjustment Disorder with Mixed Anxiety and Depression, and Dysthymia by History. On Axis II the diagnosis was Borderline Personality Disorder by History. Tr. at 336. Plaintiff saw Ms. Schacher'er on a regular basis throughout 2002 and 2003. Tr at 318–34.

Plaintiff was hospitalized at the University from September 30 to October 1, 2002. It was noted that in August she delivered a stillborn and had suffered much emotional distress. Apparently, Plaintiff had been committed to the hospital because her friends believed she was suicidal. Tr. at 338. Dr. Lewis noted that Plaintiff repeatedly stated that she was not suicidal and was just sad at the loss of her child. Plaintiff was, therefore, discharged. Tr. at 339. Plaintiff saw Dr. Lewis for follow-up

care on December 4, 2002 (Tr. at 342), and January 16, 2003. Tr. at 340.

Plaintiff saw Jennifer Niebyl, M.D. at the Center for Digestive Diseases on November 15, 2002. Plaintiff had not taken her medication for three months and was complaining of significant pyrosis[2]. Plaintiff described a poor appetite secondary to her grief. Plaintiff denied any abdominal pain but said that her bowel habits depended on her nerves. The doctor noted that in September, Plaintiff's hemoglobin was normal. Dr. Niebyl re-instituted Plaintiff's medication. Tr. at 334.

On April 25, 2003, Dr. Lewis submitted a detailed mental residual functional capacity assessment at the request of Plaintiff's representative. Tr. at 346–49. In each of the various domains, Dr. Lewis opined that Plaintiff was markedly limited. The doctor said that Plaintiff was markedly limited in the ability to deal with work stress and to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 346. He said Plaintiff was markedly limited in her ability to accept instruction and respond appropriately to criticism from supervisors or co-workers; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Tr. at 347. The doctor said Plaintiff has marked difficulties maintaining concentration, persistence or pace resulting in failure to complete tasks in a timely manner. He said that it was likely that Plaintiff would have uncontrolled crying spells during a normal work day. The

---

2. Pyrosis: Substernal pain or burning sensation, usually associated with regurgitation of acid-peptic gastric juice into the esophagus. SYN: heartburn. Stedman's Medical Dictionary, 27th Edition.

doctor responded "yes" to: "Does this patient have a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause this patient to decompensate?" Tr. at 348.

Sandi Dahm, Executive Director of the Mahaska Health Partnership, Mahaska Hospice, wrote on April 28, 2003, that it was her opinion, as a grief counselor, that it was not to Plaintiff's benefit to seek employment. Tr. at 353. Plaintiff was seen for grief counseling twenty times between August 23, 2002 and May 9, 2003. Tr. at 354—77.

The Court has read Plaintiff's testimony before the ALJ on May 1, 2003 (Tr. at 396–431), no purpose, however, would be served by summarizing it here. After Plaintiff testified, the ALJ called Elizabeth Albrecht to testify as a vocational expert. Tr. at 431. The ALJ asked the following hypothetical question:

My first assumption is that we have an individual who is 25 years old. She was 22 years old as of the alleged onset date of disability. She is a female. She is a high school graduate and she did complete one semester of college. She has past relevant work, as you've indicated, in exhibit 24E and she has the following impairments. She has inflammatory bowel disease, polycystic ovary disease, acanthosis nigricans, a history of iron deficiency anemia, obesity. A history of migraine headaches, a history of major depressive disorder, a dysthymic disorder and borderline personality trait disorder and as a result of a combination of those impairments, she has the residual functional capacity as follows. She cannot lift more than 20 pounds—excuse me, lift 10 pounds, with only occasional bending, stooping, squatting, kneeling, crawling or climbing. She is not able to do very complex or technical work, but she is able to do more than simple, routine, repetitive work, which does not require very close attention to detail. She can have only occasional contact with the public. She should not work at more than a regular pace and that's usually—three speeds of pace being fast, regular and slow and she should not work at more than a mild to moderate level of stress. Would this individual be able to perform any jobs she previously worked at either as she performed it or as it is generally performed within the national economy and if so, would you please specify which job.

Tr. at 440. In response, the vocational expert testified that Plaintiff's past work as a cashier, data entry clerk, and assembly press operator could be done. The vocational expert also said that Plaintiff had obtained skills which would be transferable to other work under the restrictions of the hypothetical. Tr. at 441. The ALJ asked a second hypothetical:

The next hypothetical would be an individual of the same age, sex, education, past relevant work and impairments as previously specified and this would be an individual who would have the residual functional capacity as follows. This individual could lift [no?] more than 10 to 15 pounds with standing limited to 10 minutes at a time, walking of one to two blocks at a time with only occasional squatting or climbing. This individual is not able to do—or only able to do only simple, routine, repetitive work that does not require close attention to detail. She can have only occasional contact with the public. She does require occasional supervision. She should not work at more than a regular pace or more than a mild level of stress. Would this individual be able to perform the jobs she previously work at either as she performed it or as it is generally performed in the national economy?

Tr. at 441–42. In response, the vocational expert testified that the limitations would limit Plaintiff to unskilled work, which would preclude her past work and the jobs to which her skills would transfer. Tr. at 442. The vocational expert said that sedentary unskilled jobs such as addresser, final assembler, and touch-up screener would be possible. Tr. at 443. On cross examination, the vocational expert testified that the limitations noted by Dr. Lewis would eliminate competitive work. Tr. at 443–46. The vocational expert said: "If it was an ongoing thing and the individual would not be able to complete their job due to [crying spells] and would be disruptive in the work place, I would say that would preclude that individual from competitive employment." Tr. at 445.

In his decision, the ALJ wrote that the examining physicians wrote that Plaintiff maintained the ability to interact with supervisors, co-workers, and the general public and that memory, concentration and pace appeared adequate. The ALJ went on to write:

> The undersigned acknowledges that the claimant's primary care physician, Jerry Lewis, M.D. has indicated that the claimant is unable to maintain substantial gainful activity. However, no weight is given to this checklist opinion because Dr. Lewis simply completed a check-off form. The items checked are inconsistent with Dr. Lewis' treatment notes and a GAF of 65 that he assigned contemporaneous with the completion of the check list.

Tr. at 29. The ALJ found that Plaintiff had not engaged in substantial gainful activity since November 30, 2000. He found that Plaintiff has severe impairments which do not meet the requirements of any listed in 20 C.F.R. pt. 404, subpt. P, app. 1. Tr. at 30. The ALJ found that Plaintiff has the residual functional capacity consistent with his first hypothetical, and that she is able to do the type of work cited by the vocational expert, including her past relevant work. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975). *See also Patrick v. Barnhart,* 323 F.3d 592, 595 (8th Cir.2003).

Plaintiff is a young woman with numerous physical and mental problems all of which are amplified by poverty which makes it more difficult for her to see her doctors and obtain treatment than if she

were a person of financial means. Nevertheless, as detailed above, Plaintiff sees the doctors at the University of Iowa, as she is directed. Plaintiff, first and foremost, suffers from depression. The depression is accompanied by a borderline personality disorder. Dr. Lewis is her treating psychiatrist. In addition, Plaintiff suffers from a number of other impairments, such as anemia and colon disease, which account for her symptoms of pain and fatigue. The ALJ's primary error in this case is his rejection of Dr. Lewis' opinion in favor of that rendered by psychologist Richard Martin. In *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001), The Court wrote:

> "The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] record.' " *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir.2000) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Id.* at 1013. Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give good reasons for that weighting. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)).

Here, the ALJ did not give good reasons for rejecting Dr. Lewis' opinion. The fact that the doctor responded to a questionnaire does not automatically disqualify his answers. In *O'Leary v. Schweiker*, 710 F.2d 1334, 1341 (8th Cir.1983), the Court held that a physical capacities checklist submitted by a consulting physician, while admissible, was entitled to little weight and did not constitute substantial evidence on the record as a whole. The *O'Leary*

Court, however, cited to *Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir.1974). Mrs. Landess was a claimant for widow's benefits. At the time, it was necessary that she prove her claim at the third step of the sequential evaluation, i.e. that she met or equaled a listed impairment. Her doctor had submitted a letter to the Appeal Council stating his opinion that she was not able to do manual labor due to her impairments. The Court, Judge Lay, wrote that although she had shown an inability to do manual labor, the medical reports fell short of disclosing whether Mrs. Landess was so disabled that she cannot pursue any gainful activity. *Id.* In footnote 2, Judge Lay wrote:

> It might be advisable for the Secretary to submit a short set of interrogatories to examining physicians which will require the physician not only to set forth his full detailed opinion as to the extent of disability but also whether in his opinion the claimant was disabled from pursuing substantial gainful activity or, in a widow's case, any gainful activity within the relevant time period of disability. We note Health, Education and Welfare medical advisers utilize forms giving their opinions.

*Id.* Thereafter, in the body of the opinion, Judge Lay continued that because medical diagnosis is seldom an exact science, the Secretary, now the Commissioner, and reviewing courts must closely scrutinize the evidence to avoid miscarriages of justice. "For the right to disability payments is a significant one to the applicant; it may well constitute the only ray of hope left to him." *Id.* In *Landess*, the ALJ had relied on the reports of medical advisers who had not examined the claimant. Judge Lay wrote: "We think these written reports, without personal examination of the claimant, deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is

hardly a basis for competent evaluation without a personal examination of the claimant." *Id.* at 1190. In short then, the interrogatories submitted by claimant from Dr. Lewis are not the type of "checklists" which the courts have said are entitled to little or no weight.

Another reason given by the ALJ for rejecting Dr. Lewis opinion was that it was inconsistent with his frequent Axis V diagnoses which were relatively high. Psychiatrists and psychologists often use a multiaxial diagnostic system. Each axis refers to a different domain of information which may help the clinician plan treatment and predict outcome. There are five axes in this system: Axis I lists clinical disorders such as depression, anxiety, schizophrenia, etc. and other conditions which may be a focus of clinical attention; Axis II, lists personality disorders and mental retardation; Axis III lists general medical conditions; Axis IV lists psychosocial and environmental problems; Axis V is the global assessment of functioning. Diagnostic And Statistical Manual Of Mental Disorders, Fourth Edition Text Revision (DSM–IV–TR) at 27. The global assessment of functioning "is for reporting the clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment and measuring its impact, and in predicting outcome." DSM–IV–TR at 33. The DSM–IV–TR also states:

> When the DSM–IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM–IV mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," or "mental defect." In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is usually required beyond that contained in the DSM–IV diagnosis. This might include information about the individual's function. It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.

DSM–IV–TR at xxxii-iii.

By deciding, on his own, the meaning of Dr. Lewis' diagnostic codes, the ALJ invaded the province of the physician. Two observations come to mind: First, as Judge Posner pointed out, psychiatrists are the experts on mental health, not lawyers or judges (*Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir.1995)); Second, an ALJ may not play doctor or substitute his own opinion for that of a physician (*Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996)). Referring to medical reports which are "merely diagnostic in nature," Judge Lay wrote: "An administrative Law Judge may not draw his own inferences from medical reports." *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir.1975). The Axis V diagnoses in Dr. Lewis' extensive treatment records, therefore, is not a good reason to reject his opinion.

■ Rather than rely on the treating physician, the ALJ wrote:

> Examining physicians (Sic—the only "physician" to express such an opinion was Dr. Martin, and he is a psychologist rather than a physician) stated that the claimant maintained the ability to interact with supervisors, co-workers, and the general public and that memory, concentration and pace appeared adequate. Upon reviewing the evidence,

non-examining physicians opined that the claimant appeared to maintain the ability to work within a wide range of simple unskilled and semi-skilled vocational situations. Tr. at 29. It is well settled law in this Circuit that reliance on non-treating, or non-examining doctors to form an opinion on a claimant's residual functional capacity does not satisfy the ALJ's duty to fully and fairly develop the record. *Dixon v. Barnhart*, 324 F.3d 997, 1002 (8th Cir. 2003) citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir.2000). Although Dr. Martin examined Plaintiff, he did so on only one occasion and he was not provided with any medical records for his review. Furthermore, Dr. Martin also wrote: "However, given her underlying emotional problems, poor coping skills, and notable borderline personality disorder features, she does appear likely to experience problems with interacting with supervisors, co-workers, and the public." Tr. at 293. Dr. Martin's report, therefore, does not provide a good reason for rejecting Dr. Lewis' opinion.

■ For the aforementioned reasons, therefore, the ALJ's finding that Plaintiff has the residual functional capacity to work as outlined in his hypothetical questions to the vocational expert is not substantial evidence which will support his decision. The question remains, however, whether the Court should remand to take additional evidence or reverse and order benefits paid. In *Hinders v. Barnhart*, 349 F.Supp.2d 1218 (S.D.Iowa) 2004[3], (S.D.Iowa December 21, 2004), the Court discussed the issue of remand versus reversal, with specific citations to *Seavey v. Barnhart*, 276 F.3d 1 (1st Cir.2001). In *Seavey*, at 11, the Court adopted the rule that an order to an agency to provide the relief it has denied is appropriate when the agency has no discretion to act in any manner other than to award or deny benefits.

In the case *sub judice*, the vocational expert testified that when Dr. Lewis' opinion is considered, no work is possible for a person thus limited. Dr. Lewis' opinion, as shown above is the only evidence of any substantiality in this record. In the opinion of this Court, a remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is clearly entitled. *See Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir.1987) ("...where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.").

In *Bradley v. Bowen*, 660 F.Supp. 276, 279 (W.D.Ark.1987), Circuit Judge Richard S. Arnold, sitting by designation as a district judge, wrote:

The weighing of conflicting evidence is generally a matter of fact-finding for the ALJ, and will not be disturbed on review if the result is one which " 'a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 ... (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 ... (1938). But there are occasions when the bulk of the evidence is transparently one-sided against the ALJ's decision. In those instances, the reviewing court must reverse the administrative determination on the ground of unreasonableness. *See Gavin*, 811 F.2d. At 1199–1201... and see generally, *Deuter v. Schweiker*, 568 F.Supp. 1414 (N.D.Ill. 1983).

**3.** Page references are not yet available on Westlaw.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The final decision of the Commissioner is reversed and the Commissioner is ordered to award Plaintiff the benefits to which she is entitled. The case is remanded for the sole purpose of computing and awarding Plaintiff the benefits to which she is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[4].

IT IS SO ORDERED.

---

4. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."