Brooks John BOERTJE, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

No. 4:11–cv–397 RP–RAW.

United States District Court, S.D. Iowa, Central Division.

March 23, 2012.

Gretchen R. Jensen, Schott Mauss & Associates, Des Moines, IA, for Plaintiff.

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Plaintiff, Brooks John Boertje, filed a Complaint in this Court on August 30, 2011, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed an application for benefits May 2, 2009. Tr. at 129–30. Plaintiff, whose date of birth is October 8, 1973 (Tr. at 129), was 36 (Tr. at 32) years old at the time of the hearing on July 23, 2010, before Administrative Law Judge Mark R. Dawson (ALJ). Tr. at 28–53. The ALJ issued a Notice Of Decision—Unfavorable on August 6, 2010. Tr. at 7–20. The Appeals Council declined to review the ALJ's decision on July 1, 2011. Tr. at 1–4. Thereafter, Plaintiff commenced this action.

Using the familiar five step sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity after March 24, 2009, the alleged amended onset date. The ALJ found Plaintiff has the following severe impairments: bipolar disorder; ischemic cardiomyopathy, status post myocardial infarction, with stenting; type II diabetes; ischemic diabetic retinopathy; hypertension; and, a single incident of seizure. Tr. at 13. The ALJ found that Plaintiff's impairments were not severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 14. At the fourth step, that ALJ found

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as

defined in 20 C.F.R. § 404.1567(a) except to lift no more than ten pounds frequently nor more than ten pounds occasionally; to sit up to 6 hours in an 8 hour workday, needing to shift positions every 10–15 minutes; to stand and/or walk up to 2 hours; only occasionally to balance, climb, crawl, crouch, kneel and/or stoop; frequently to reach, handle, finger and/or feel; with moderate limitation in ability to socially function in an appropriate manner which precludes work for which public interaction is a primary job component; and with moderate limitation in the ability to concentrate defined as precluding assembly jobs which do not allow for at least a brief pause occasionally.

Tr. at 15. The ALJ found that Plaintiff is unable to perform his past relevant work. Tr. at 20. At the fifth step, the ALJ found that Plaintiff is able to do a significant number of jobs, examples of which include addresser, or document preparer. Tr. at 21. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 22.

## MEDICAL EVIDENCE

On March 24, 2009, Plaintiff was seen by Dale T. Steinmetz, M.D. Plaintiff complained of generalized malaise, fatigue, and depression. Plaintiff told the doctor that he had controlled his conditions with diet and exercise and had been off medications for the previous 4–5 years. In the recent past, however, he had not been able to keep his diet or exercise regularly and felt the need to seek medical attention again. The doctor noted that Plaintiff had a new job "but remains very sedentary with that job." When the doctor checked Plaintiff's blood pressure, it was 180/130. The doctor wrote that Plaintiff appeared to be "a perfectly healthy 35–year–old male not in any discomfort." The doctor recommended that Plaintiff be hospitalized to get his blood pressure under control and to "pump some IV fluids in him ..." Plaintiff, however, "refuses hospitalization against medical advice." Diagnoses were hypertensive crisis, diabetes not controlled, history of coronary artery disease without symptoms, fatigue, and suspected depression and anxiety. The doctor noted appointments with a cardiologist and a psychiatrist. Plaintiff was given samples of medication and told to return the next day. Tr. at 328. When he was seen the next day, Plaintiff's diagnosis had gone from hypertensive crisis to "just plain hypertension." Tr. at 325.

On March 26, 2009, Plaintiff saw Michael C. Fraizer, M.D. at the Iowa Heart Center to reestablish his medical care after an absence due to lack of medical insurance. Plaintiff was described as a 35 year old man with a history of an inferior infarct treated with right coronary artery implant in 2001. The week before, Dr. Steinmetz, prescribed Bystolic, Glucovance, and lisinopril. Plaintiff reported feeling fatigued and dehydrated. He said that frequent urination wakes him up at night. Plaintiff said he was not having chest pain but described mild shortness of breath. Tr. at 313. At the conclusion of his report, Dr. Fraizer wrote that he agreed with the medication prescribed by Dr. Steinmetz. Dr. Fraizer advised Plaintiff to add an 81 mg aspirin. Plaintiff was to return in three months at which time a stress test would be considered. Tr. at 315.

On April 1, 2009, Dr. Steinmetz wrote that Plaintiff's conditions were improved, but were not controlled. Tr. at 323. On April 15, 2009, Plaintiff saw Dr. Steinmetz. Plaintiff reported feeling tired and run down which the doctor said was systemic symptoms of accelerated blood pressure. Tr. at 321.

On April 30, 2009, Plaintiff saw Thomas Koithan, D.O. for a psychiatric evaluation. Tr. at 342–45. Plaintiff reported symptoms of depression, anxiety, and mania.

Under the heading of depression, Plaintiff reported difficulty with memory, concentration, motivation, appetite, and sleep; he reported feelings of guilt; feelings of isolation; and, feelings of anger. Plaintiff reported symptoms consistent with anxiety and obsessiveness and compulsiveness. Under the heading of mania, Plaintiff reported increased energy, increased sense of grandiosity and euphoria, poor judgement and insomnia. Tr. at 342. Plaintiff reported that he had been unemployed since December 2008. He told the doctor that since college[1] Plaintiff had 50 to 75 different jobs, "about 50/50 between quitting or being fired." Tr. at 343. Plaintiff was given a prescription for Lamictal and instructed in its use. Tr. at 344. Dr. Koithan's diagnosis, on Axis I, was bipolar disorder, not otherwise specified. On Axis II, the diagnosis was deferred. On Axis V—Global Assessment of Functioning (GAF)—the score was: "An initial Score of 55 was recorded on 5/3/2009. The Highest Score was 65." Tr. at 345.

On August 26, 2009, Plaintiff underwent a treadmill stress test, but it was non-diagnostic due to an inadequate heart rate. Tr. at 380.

On November 2, 2009, Plaintiff went to see Dr. Steinmetz but was seen by Randall D. Miller, D.O. It was noted that Plaintiff had not seen Dr. Steinmetz since March in spite of being advised to do so. Plaintiff complained of abdominal pain and vomiting. He told Dr. Miller that he had not been able to take his medication for 4 days and on examination his blood pressure was 192/122. Plaintiff was given medication for the vomiting, and told to see Dr. Steinmetz about the blood pressure. Tr. at 426.

Plaintiff saw Dr. Steinmetz on November 12, 2009. The doctor adjusted Plaintiff's medications, trying to make them as affordable as possible so Plaintiff could take them regularly. Tr. at 423.

Plaintiff saw Dr. Koithan on November 30, 2009. Plaintiff reported that he was taking his medication but was continuing to have mood swings. Tr. at 443. The Axis V score on November 30, 2009 was 61. Tr. at 444. On January 13, 2010, Plaintiff told Dr. Koithan that he was less agitated and his mood had lightened with the addition of Wellbutrin. His wife had also noticed positive changes. Tr. at 445. The Axis V score 64. Tr. at 447.

Plaintiff also saw Dr. Steinmetz on January 13, 2010. Plaintiff told the doctor that he was taking his medication as prescribed and checking his blood sugars regularly, but the doctor noted Plaintiff's wife had told him differently when seen two week previously. The doctor hoped that Dr. Koithan's treatment would help get Plaintiff's mental illness under better control which would also help Plaintiff get better control of his metabolic syndrome. Dr. Steinmetz questioned Plaintiff about alcohol use, and Plaintiff denied he was drinking. Tr. at 453.

On February 22, 2010, Plaintiff saw Dr. Steinmetz in followup from an emergency room visit. On the 20th, Plaintiff, while at a mall with his wife, experienced a seizure. Plaintiff admitted not taking his diabetes medication—metformin—because it upsets his stomach. The doctor opined that Plaintiff's loss of consciousness and syncope was hypoglycemic with seizure activity related to it. The doctor wrote that an EEG and neurology opinion was needed. Tr. at 450.

On February 23, 2010, Plaintiff saw neurologist David L. Friedgood, D.O. Plaintiff told the doctor that the night before the seizure event, he had four beers to

---

1. At one point the doctor wrote that Plaintiff had five years of college but no degrees. But, on the same page, the doctor wrote: "... since graduating from college."

drink. He said that he uses some alcohol on a nearly daily basis. It was noted that Plaintiff has nightly episodes of myoclonic-type jerks, and his wife noted that there are times when he seems to jerk at night. Tr. at 454. Dr. Friedgood's diagnoses included: "Isolated seizure. Risk factors for his seizures include dietary indiscretion associated with diabetes mellitus, ethanol use, and possibly an underlying sleep disorder." Dr. Friedgood recommended that Dr. Koithan consider prescribing another antidepressant because Wellbutrin sometimes causes seizures. He also recommended that Plaintiff obtain a sleep center evaluation, decrease his use of alcohol to a maximum of two servings of beer per day, and discontinue tobacco. Tr. at 455.

Plaintiff saw Dr. Koithan on February 24, 2010. Plaintiff told the doctor about the possible seizure event and his visit with Dr. Friedgood. Dr. Koithan said he would discuss Plaintiff's care with Dr. Friedgood. The dosage of Lamictal was changed. Tr. at 482. The Axis V score was 62. Tr. at 484.

On March 1, 2010, Plaintiff's wife told Dr. Koithan that Plaintiff had stopped taking Wellbutrin on the advice of Dr. Steinmetz, and that Plaintiff was irritable and depressed. Dr. Koithan noted that he had consulted with Dr. Friedgood and he was of the opinion Plaintiff could continue with the Wellbutrin. Tr. at 484.

On March 9, 2010, Plaintiff told Dr. Koithan that Dr. Steinmetz had prescribed Celexa in place of Wellbutrin. Plaintiff said he did better with Wellbutrin, but he and the doctor decided to continue with the Celexa to see if it would be more beneficial with time. Tr. at 485. The Axis V score was 62.

On April 7, 2010, Plaintiff told Dr. Koithan that while he was having some ups and downs, the medication Lamictal had helped and his mood was more even. "He feels that it gets better the longer he is on the Lamictal." Tr. at 487. The Axis V score was 63. Tr. at 489.

On April 22, 2010, Plaintiff saw Neil Silbermann, M.D. for an eye examination. The examination showed decreased visual acuity with best corrected vision in the right eye of 20/40–[2] and in the left of 20/40. The examination revealed several problems, including preimacular scar, blot hemorrhages, background retinopathy with cotton wool spots and microaneurysms. The doctor opined that Plaintiff's decrease in vision was due to ischemia. Dr. Silbermann "emphasized the importance of Brooks being followed, because of the risk of development of proliferative diabetic retinopathy." Tr. at 456.

On April 22, 2010, Plaintiff also saw Dr. Fraizer at the Iowa Heart Center for a follow-up appointment. Plaintiff reported that he felt well, but had some dyspnea with exercise. Tr. at 459. On physical examination, Plaintiff's blood pressure was 160/100. Tr. at 460. The doctor's diagnosis included left ventricular dysfunction with an ejection fraction in the 40% range and that his blood pressure was too high. The doctor adjusted one of Plaintiff's medications and advised Plaintiff to stop smoking and to continue taking aspirin. Tr. at 461.

On June 17, 2010, Plaintiff saw Dr. Steinmetz. For the previous couple of months, Plaintiff had spells of vomiting which he attributed to one of his medications—citalopram. When he would stop taking the medication, the vomiting stopped, and when he began taking it again, the vomiting returned. During this visit, Plaintiff asked the doctor to recommend another psychiatrist. The doctor told Plaintiff to stay off the citalopram but

**2.** The Court is unaware of the significance of the minus sign behind the number 40.

to continue with all his other medication. The doctor wrote that A1c tests had shown the diabetes was in good control. The doctor also recommended two other psychiatrists at Mercy Franklin clinic. Tr. at 475.

On July 12, 2010, Plaintiff reported to Dr. Koithan that he did not tolerate Celexa. Plaintiff was having blackouts and falling down. The spells stopped when he quit taking Celexa. The doctor prescribed Wellbutrin again. Tr. at 489. The Axis V score was 62. Tr. at 491.

On July 17, 2010, Dr. Steinmetz completed a set of interrogatories in which he opined that Plaintiff should not lift more than 10 pounds either occasionally or frequently. He opined that Plaintiff should stand/walk no more than 2 hours in an 8 hour workday. He said Plaintiff must alternate positions every 10 to 15 (the doctor's handwriting is not clear on the last digit of this number) minutes. Tr. at 476. Dr. Steinmetz, opined that while Plaintiff would be able to do a job demanding sedentary exertion, his psychiatric condition was not controlled, and Plaintiff would likely be absent from work, on average, 4 days per month. Tr. at 478.

On July 20, 2010, Plaintiff reported to Dr. Koithan that he was tolerating the Wellbutrin well, and wanted to continue it. The doctor noted that he had completed some forms for Plaintiff's Social Security case. Tr. at 491. The doctor wrote:

> He feels in a short period of time he has been on the Wellbutrin XL, he is optimistic that things will be better in the long run based on some improvement in mood previously. He however remains disabled in my opinion. I do not see significant improvement to the point of employment in the near future and he very well may be chronically disabled. I did complete the paperwork for him today for Social Security disability.

Tr. at 491–92. The Axis V score was 56. Tr. at 493. The "paperwork" to which Dr. Koithan referred is dated July 20, 2010. The doctor wrote that Plaintiff is markedly limited in his ability to understand and remember very short and simple instructions and tasks because his moods fluctuate unpredictably between highs and lows. The doctor wrote that Plaintiff has been unable to maintain employment since May of 2007 because of his impairments. The doctor wrote that social isolation prevents Plaintiff from interacting with the public, supervisor, or co-workers. He wrote that Plaintiff does not deal well with any unexpected change. Tr. at 480. The following question was put to the doctor, and his answer follows:

> Your treatment records estimate Brooks Boertje's global assessment of functioning (GAF) scores in the high 50s and 60s. According to the DSM–IV–R, GAF scores in this range reflect "moderate symptoms." Some evaluators and judges within the Social Security Administration believe an individual with moderate symptoms is capable of working in a standard competitive work environment. Are your GAF scores intended to reflect Brooks Boertje's level of functioning while working? If not, please explain what impact you would anticipate if Brooks Boertje returned to competitive employment.
>
> No. His level in my opinion under those circumstances would be 45 to 50 at max.

Tr. at 481.

On March 31, 2011, Plaintiff was seen at Broadlawns Medical Center by order of the Iowa District court for Dallas County (Tr. at 500–07). During the admission evaluation, Plaintiff said he had been drinking 3–4 cans of beer per day, but he had earlier told the Crisis Team that he had been drinking 4–6 cans of beer with shots of rum throughout the day. Plaintiff

stated that over the previous few weeks, his depression and isolation had increased. He said he had been sleeping up to 16 hours per day. Tr. at 508. Plaintiff denied any illegal drug use. Tr. at 509. After a mental status examination (Tr. at 509), physical and neurological examinations (Tr. at 510), Plaintiff was diagnosed with bipolar disorder by history and alcohol abuse. Tr. at 510. Plaintiff was admitted as a psychiatric patient to monitor his mood, behavior and vital signs. Tr. at 511.

## ADMINISTRATIVE HEARING & DECISION

Plaintiff appeared at a hearing on July 23, 2010. Tr. at 28–53.

After Plaintiff testified, Brian George Paprocki[3] was called to testify as a vocational expert. Tr. at 47. The ALJ's first hypothetical was based on the limitations given by Dr. Steinmetz' physical limitations. The vocational expert testified that those limitations would limit an individual to sedentary work and he identified several examples of such work. Tr. at 49. When the ALJ added moderate limitations in the ability to function socially, and the ability to concentrate, the vocational expert eliminated several of the jobs he had previously identified, but said that unskilled clerical jobs such as a document preparer and address would still be possible. Tr. at 49–50. When Dr. Koithan's limitations were referenced, the vocational expert said all work was precluded. Tr. at 51.

In his decision, the ALJ wrote that he found Dr. Koithan's opinion to be inconsistent with his treatment notes, because of high Global Assessment of Functioning

(GAF) scores which, according to the ALJ indicate an ability to work with moderate limitations. In pertinent part, the ALJ wrote:

> ... Furthermore, Dr. Koithan stated that his statement was consistent with his records, but his treatment notes record an initial GAF of 55 ... which by late November 2009, had improved to 61 ... As indicated above, the GAF is useful as a shortcut, snapshot tool to express a mental health practitioner's subjective assessment of a claimant's overall functioning at a specific point in time. Dr. Koithan updated his assessment of the claimant's global functioning as (sic) every encounter. Although the Agency does not rely on a GAF score by itself to indicate a level of disability, here, these scores were all assigned by the same professional. After November 2009, the only time Dr. Koithan assessed another GAF below 50, was on the day that the claimant brought in the MSS form, which directed the doctor to address why the doctor's GAF assessments over the course of at least six months were so out of line with the doctor's claim in the treatment notes of July 20, 2010 and in the MSS. In fact, on July 20, even though the claimant reported less irritability, without significant side effects, and feeling optimistic in the short period of time on Wellbutrin XL based on the claimant's improved mood, Dr. Koithan surprisingly wrote that the doctor did not anticipate improvement to the point that the claimant could work in the near future or perhaps ever ... Yet, just eight days before, Dr. Koithan assessed the claimant's GAF at 62 ... Further-

---

**3.** Most of the notations in the record refer to "George" Paprocki. E.g. Tr. at 47. However, at the hearing the ALJ said: "Also present is the vocational expert Mr. Brian [INAUDIBLE] ..." Therefore, the Court is of the belief that the vocational expert was Brian George Paprocki who testifies at many Social Security Disability hearings as a vocational expert.

more, the prior assessment in April 2010, indicated a GAF of 63 . . . .

Tr. at 19.

## DISCUSSION

■■■■ We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004). We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola [v. Astrue]*, 480 F.3d [885] at 886 [8th Cir.2007] ). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005). *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008). In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

In *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc), the Court wrote: "Probably the most important issue will be the question of RFC . . ." The Court went on: "The RFC that must be found . . . is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." While an ALJ is charged with determining a residual functional capacity based on all the evidence, it is a medical question and must be supported by some medical evidence. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.2001).

Plaintiff raises several issues relating to the substantiality of the evidence supporting the ALJ's decision which has become the final decision of the Commissioner. Plaintiff's arguments can be summarized in his contention that the ALJ improperly rejected the opinion of Dr. Koithan, Plaintiff's treating psychiatrist, because the ALJ relied too heavily on the Axis V GAF scores.

The GAF scale is used to "consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM–IV–TR) at 34. The continuum is a set of categories from 0 (inadequate information) to 100 (superior functioning). In between there are 10 categories, 1–10, 11–20, . . . 91–100. Between 51 and 60, moderate symptoms are described, with moderate difficulty in, among other things, occupational functioning. 61 to 70 describes mild symptoms including occupational functioning.

The DSM–IV–TR, itself cautions that these scores are not to be used in forensic settings. *See McPherson v. Barnhart*, 356 F.Supp.2d 953, 962 (S.D.Iowa 2005). Plaintiff specifically asked Dr. Koithan if he used Axis V as a way to indicate Plain-

tiff's ability to function in competitive work and he replied in the negative and said that the scores would be between 45 and 50, indicating serious limitation in the ability to work "unable to keep a job." DSM–IV–TR at 34.

In *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir.2004), the Court wrote:

The ALJ should determine a claimant's RFC "based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir.2000). He may not simply draw his own inferences about Plaintiff's functional ability from medical reports. *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir.2003).

The *Strongson* Court went on, also at 1070:

The ALJ should give more weight to the opinion of doctors who have treated a claimant regularly over a period of months or years because they have a "longitudinal picture of [the] impairment." *Shontos*, 328 F.3d at 426 (citing 20 C.F.R. § 404.1527(d)). It is appropriate, however, to disregard statements of opinions by a treating physician that "consist[s] of nothing more than vague, conclusory statements." *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996). In addition, the ALJ need not give controlling weight to a physician's RFC assessment that is inconsistent with other substantial evidence in the record. *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir.2001).

■ In the case at bar, the Dr. Koithan's answers to the interrogatories, are not mere conclusory statements, they are answers to specific questions about Plaintiff's ability to work, day in and day out in competitive and sometimes stressful conditions in which real people work in the real world. *See, McCoy v. Schweiker*, 683 F.2d 1138 *supra*.

Dr. Koithan answers are also consistent with his treatment notes. In the first place, the treatment notes do not address Plaintiff's ability to function in a workplace. They record Plaintiff's medical conditions and how he responds to the treatment provided. This is the very reason why the agency or advocate solicits medical source statements regarding a claimant's ability to work. *See, e.g.* 20 C.F.R. § 404.1513(c)(2).

■ Dr. Koithan's opinions are uncontradicted. By rejecting them for reasons which are unsupported by the record as a whole, the ALJ ignored the law of the Eighth Circuit, "which states that the ALJ must not substitute his opinion for those of the physician." *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir.1990) citing *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir.1989). Furthermore, Dr. Koithan's opinion is consistent with the opinion of Dr. Steinmetz who wrote that Plaintiff would likely be absent from work four days per month because of his mental illnesses.

The ALJ pointed to Dr. Koithan's notes that on occasion, Plaintiff reported less irritability or improvement in his moods. The ALJ wrote that this represented an inconsistency with the doctor's opinion that Plaintiff is unable to work. The Court disagrees. In *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir.2003), the ALJ found a doctor's statements that Cox was moving somewhat better to be inconsistent with the doctor's opinion that she was unable to work. The Court wrote: "We fail to see the inconsistency in these two statements. It is possible for a person's health to improve, and for the person to remain too disabled to work." Likewise, in the case at bar, Plaintiff's positive response to medication is not evidence that he has the ability to work day in and day out, in

competitive and stressful conditions in which real people work in the real world. No one has said it better than Judge Richard S. Arnold who wrote the Court's opinion in *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc).

The Court's conclusion regarding the lack of substantial evidence on the record as a whole in support of the Commissioner's decision is further buttressed by Plaintiff's vocational history. Dr. Koithan's office note of April 30, 2009, states: "He was last employed by Holdings in December of 2008. He has had 50 to 75 different jobs since graduating from college. He indicates the jobs were about 50/50 between quitting and getting fired." This reflects of Plaintiff's "real world" ability to not only secure employment, but to keep it. In *Tennant v. Schweiker*, 682 F.2d 707 (8th Cir.1982), the Court found similar evidence to be compelling. Judge Heaney, at 710, wrote: "Tennant has held *forty-six* jobs in his twelve years of employment. His longest tenure at any job was six months. It appears that he has been fired from most of these jobs." (emphasis in original). It cannot be overlooked that "employers are concerned with substantial capacity, psychological stability and steady attendance." *See, Rhines v. Harris*, 634 F.2d 1076, 1079 (8th Cir.1980).

### CONCLUSION AND DECISION

The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing text noted in *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987), and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole. This case is reversed and remanded for an award of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406(b)), and LR 54.2(b) [4]. *See also, Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart*, 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

4. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."